Grand Rapids and Indiana Railroad Company agt. Sanders.

# SUPREME COURT.

## Grand Rapids and Indiana Railroad Company agt. Joshua C. Sanders.

*Railroad mortgage bonds — rights of bona-fide purchaser against the company — over-due coupons.*

Where a railroad corporation, through its president, borrowed money of its agent, and pledged with him mortgage bonds as security, although the agent could, as between himself and the corporation, only hold the bonds as security for the loan, on repayment of which they should be surrendered to the company, yet a person in good faith purchasing the bonds from the agent could hold them for at least the amount he paid for them.

The amount paid for the bonds may be taken into consideration in determining the question of good faith.

And where the purchaser from the agent afterwards sells the bonds to a *bona fide* purchaser, the fact that the bonds were then over due will not preclude the last purchaser from holding on to the bonds as indemnity for the amount he paid, although in excess of the sum originally borrowed by the company upon them.

An honest purchaser from the agent of the company can give a good title to another, although the bonds had become due before the last transfer.

The question of a *bona fide* purchaser considered, as also effect of the clause making the principal due, by an omission to pay an installment of interest.

Under the circumstances of this case the last purchaser was held entitled, in an action brought against him by the company for the recovery of the bonds, to detain them as indemnity for the amount he had paid on their purchase.

*Todd* agt. *Shelbourne* (8 *Hun*, 510) applied.

Over-due coupons detached from railroad bonds, payable to bearer, are negotiable instruments.

*Special Term, April,* 1877.

ACTION to compel the surrender and delivery, to the plaintiff, of certain railroad mortgage bonds, claimed to have been improperly negotiated and transferred by the agents of the plaintiff.

*Dunning, Edsall, Hart & Fowler,* attorneys, and *B. F. Dunning,* of counsel for plaintiff.

*Townsend & Mahan,* attorneys, and *Charles Tracy,* for defendant.

VAN VORST, *J.* — King & Sutton were the agents of the plaintiff, through the appointment of the president of the railroad company, to aid in the negotiation of the issue of the bonds of 1861. They, in the course of their agency, loaned and advanced moneys to the president, and through their agency, as they claim, moneys were borrowed from others for the use of the president. The sums loaned, in the aggregate, were not large.

Bonds, to a large amount, were pledged by the president, to and through them, to secure these loans. These bonds were not issued or delivered by the plaintiff, through its president, for any other purpose than as such security. For loans obtained from others, King & Sutton claimed to have made themselves personally responsible. Whether these further moneys were actually borrowed from others, or were loaned by King & Sutton themselves, cannot affect the result. The moneys were actually received by the president.

The bonds in the hands of King & Sutton, or other lenders, could only be held as security for the moneys advanced upon them, as they had been issued and delivered upon no other consideration. Such, in a true sense, is the largest claim which could be made by the pledgees of the bonds.

Still, having possessed themselves of the bonds claimed by them to have been originally pledged to others, they

Grand Rapids and Indiana Railroad Company agt. Sanders.

could dispose of them, together with those pledged to themselves, to a *bona fide* purchaser. Such purchaser could, as against the company, hold the bonds at least to the amount of the consideration he in good faith paid.

It is claimed that Dunscomb was a *bona fide* purchaser for a valuable consideration from King and Sutton. The bonds had no over-due coupons annexed when he acquired his title. They were not then due. He testifies that he had no notice of the nature or extent of the claim of King and Sutton, or of any infirmity in their title. There is no evidence to contradict this statement. He claims to have acted in good faith. There is nothing to impeach his good faith, unless it be found in the nature of the consideration he paid.

Through a broker, an exchange was negotiated of lands in the city of New York for the bonds — thirty-one, of $1,000 each.

This transaction may properly be scrutinized. The lands were heavily mortgaged. There is no affirmative, satisfactory evidence of the real value of this land at the time of the exchange. I am aware of the difficulty, after the lapse of time, in arriving at the actual value of this land. But I am of the opinion that it in no degree approached the value Dunscomb says he placed upon the bonds. He took them in the exchange at from fifty to sixty cents on the dollar.

It may be said that the bonds themselves had, at the time, no established market value. This is true. The success of the railroad was not assured. But Dunscomb placed a value upon them for the purpose of the transaction, to the extent above mentioned.

King & Sutton held the land a short time only. The mortgages were foreclosed, and some of the land sold, leaving a deficiency on the sale, and the remaining land was conveyed by them to the persons who held the mortgages, to save the expense of a foreclosure.

The fact, however, that the land was sold and disposed of in this manner, does not necessarily establish that it had no

Grand Rapids and Indiana Railroad Company agt. Sanders.

real value over and above the incumbrances, when it was conveyed to King and Sutton by Dunscomb. The management of the property by King and Sutton may have been improvident. They did, after they acquired title, pay some interest and taxes. But through their failure further to pay, the premises were sold under the mortgages.

Shortly after Dunscomb became the owner of the bonds, the president became aware of the fact. Dunscomb communicated to him that he had purchased them, had given real estate in exchange for them. Without apparent hesitation he gave the president the numbers of his bonds. He testifies that the president stated to him that the bonds were valid in his hands, and a good claim against the corporation. This admission, to the full extent it is claimed to have been made by him, is denied by the president.

But he does not deny that he saw the bonds in the hands of Dunscomb, and that the numbers were given to him. He did not demand them, nor did he forbid their negotiation. In fact he made no positive claim to them.

No steps were taken to recover the bonds, and no hindrance interposed to Dunscomb's right to dispose of them.

In fact the president, in his interview with Dunscomb, in which he was informed of his title to the bonds, and how and from whom acquired, endeavored to engage his favorable interest and aid in negotiating to others, bonds of the same issue.

The price paid for the bonds, as well as that paid for the land, was a subject of negotiation and agreement, and when the transaction was closed by the conveyance of the real estate, and the exchange of the bonds therefor, it cannot be pronounced colorable only, without satisfactory evidence. There is nothing in the action of the president of the company, who had the negotiation and disposition of the bonds in his charge, to justify the conclusion that he regarded the transaction between King and Sutton and Dunscomb as unreal or wanting in the element of good faith.

It is true, that in looking at this transaction by itself, the value of the consideration actually paid on the purchase of the bonds, may well be regarded in determining its good faith (*Gould* agt. *Segee*, 5 *Duer*, 260).

But the value of the bonds themselves must also be considered. They were not regularly on the market.

Whatever disposition the president of the company had, himself, actually made of the bonds of this issue, was based on an extremely low estimate of their value.

If the value of the real estate, over and above the incumbrances, was not large, it may be said of the bonds that their then value was not established. If the value of the real estate was speculative, the same may be said of the bonds. With all his efforts the president had failed to make any substantial negotiation for the sale of the bonds, in the city of New York.

I am of the opinion that Dunscomb was a purchaser of the bonds in good faith, and for a valuable consideration.

The extent of the consideration, in value, does not clearly appear, but it was for the purposes of the transaction, substantial and sufficient to pass the title of the bonds to him, and to constitute him a valid holder of the same.

Dunscomb remained such owner for the period of four years; his right and title was unquestioned during that time, when he sold them to the defendant.

Mr. Dunning argues that when the defendant purchased the bonds from Dunscomb they were overdue. Without question, by the strict letter of the obligations, the principal of the bonds had, through a failure to pay the interest, become due. The defendant purchased from Dunscomb, in the year 1869, and they carried unpaid coupons since 1865. The provision in the bonds, in this regard, is as follows: "In case the Grand Rapids and Indiana Railroad Company shall, for the space of six months, make default in the payment of the semiannual interest, to become due on any or either of the bonds, then, after the lapse of six months, the whole principal sum,

mentioned in each and all of the bonds, *shall immediately thereafter become due and payable,* any thing herein contained to the contrary notwithstanding."

Whilst the enforced maturity of the bonds, before the time limited for the payment of the principal, through a failure to pay interest, and allowing the same to remain unpaid, directly conflicts with rights conferred upon the holders, such as the privilege of converting the same into the stock of the company at par before 1886, and of acquiring an interest in the lands granted to the corporation, upon a surrender of the bonds before the time, still, I am not prepared to decide that such result is not produced by the absolute conditions of the bonds. But, that the principal of the bonds had become due, through a failure to pay interest, when defendant purchased, is not decisive against his right to hold them as against the railroad company, to at least the amount and value of his advances. For, if Dunscomb was a *bona fide* purchaser before maturity, for a valuable consideration, he could give a good title to one purchasing from him, although the bonds should mature in his hands before a sale thereof (*Story on Promissory Notes,* sec. 191; *Miller* agt. *Talcott,* 54 *N. Y.,* 114; *Farrington* agt. *Park Bank,* 39 *Barb.,* 650 ; *Daniel on Negotiable Instruments,* secs. 724, 726, 782, 803).

In this view it would seem to be unnecessary to inquire into the circumstances under which the defendant acquired his title to the bonds purchased by him from Dunscomb, and as to whether or not he had knowledge or notice of any infirmity in the title of King & Sutton, or of any defense in favor of the plaintiff against the obligors. But as this subject was much discussed by the learned counsel for the plaintiff in his argument, it may not be out of place to examine that subject, and inquire into the good faith of the defendant, which is directly questioned.

The defendant testified upon the trial that before purchasing from Dunscomb he made a journey to Fort Wayne, and called at the office of the plaintiff at that place, and had an

interview with its secretary and treasurer, and made inquiries of them in regard to the bonds of 1861, and whether the same were repudiated. As there were several unpaid coupons on the bonds, the inquiry was natural and proper as a matter of prudence. The defendant has testified that to his inquiries the officers told him that the company did not repudiate the bonds; that the coupons were not paid for the reason that the company had not much money; and that the obligations of the company, including the issue of bonds inquired of, would be paid, except certain ones which had not the seals of the corporation.

It is true that Mr. Godwin, the secretary of the company at the time, denies that such interview took place, and alleges that he never saw the defendant until he met him in court on the trial of the action. The treasurer of the company was not examined as a witness.

I am inclined to the opinion that the evidence of the defendant is reasonable and credible, and must be accepted.

It may well be that the secretary of the company might not remember all the persons who called on him with respect to the bonds, or the condition of the road, many of whom of necessity would be strangers to him.

But the defendant testified to an isolated transaction, of interest to him, in respect to which he made a long journey, and that for the express purpose of inquiry respecting the bonds, for a purchase of which he was then negotiating.

I cannot set aside the evidence of the defendant without involving him directly in false swearing, which I am not prepared to do. The secretary might forget the circumstance, in the multiplicity of his engagements. To reject the defendant's statement is to involve him in direct, unequivocal falsehood. In addition, the defendant testifies that on the day following the interview at Fort Wayne he wrote to Dunscomb the particulars of the conversation with the officers. This was in May, 1869, and in June following he purchased the bonds.

The testimony of the defendant is also more satisfactory with respect to the interview between himself and Mr. Poor.

Poor states that he told the defendant the latter part of the year 1868, or early in 1869, that the company had received no consideration for the bonds; that they repudiated their payment; that he considered the entire issue a fraud.

The witness fixed no month in which this conversation took place, nor the year even, except as above stated, and in his cross-examination stated that the interview was in the spring of 1869.

I do not understand the evidence of Mr. Poor to be positive that this conversation took place before defendant claimed to have purchased the bonds. He *thinks* defendant inquired whether it would be safe to purchase. He *thinks* that was his object. He did *not think* he had already bought.

On the other hand, the defendant swears positively that the inquiries he made of Mr. Poor were after he had actually bought the bonds, and were made for the purpose of taking measures to enforce their payment, Mr. Poor being one of the trustees.

Nor is the statement of Mr. Poor strictly correct, that the company had received no consideration for the bonds, for, upon his cross-examination, he testified that he received from Sutton & King $300, and delivered certain of the bonds to them, and that the money he so received he handed to Mr. Lomax, the president. To this extent, at least, Mr. Poor himself is identified with, and cognizant of, the transactions between King & Sutton and the president of the company, to whose custody the bonds appear to have been intrusted by the corporation.

The defendant testifies that he had neither seen nor heard, before his purchase, of any report or circular, and had no notice or knowledge of any facts by which the validity of the bonds was questioned.

The unpaid coupons on the bonds when defendant acquired title did not necessarily constitute notice of any invalidity in the bonds. The interest might remain unpaid, not from any

infirmity in the bonds themselves, but through want of means in the plaintiff to pay the same. But if they suggested inquiry, that was in fact made of the officers of the company by the defendant before he purchased, and a reason assigned for non-payment, was a want of means.

This version of the evidence with respect to the defendant's purchase does not show, that he had notice of plaintiff's defense to the bonds.

The defendant was a purchaser for value from Dunscomb. The price agreed to be paid was $300 for each bond, with the coupons since 1865 annexed. The principal of the bonds amounted to $31,000, with unpaid coupons for four years. He gave his note for $3,611.55 for a portion of the consideration, and satisfied a claim in his favor growing out of a transaction in Washoe Tool Company stock, to the amount of $5,000 and upwards. The consideration was valuable, and sufficient to uphold defendant's purchase and title. The note was paid by the defendant. There is nothing, therefore, to impeach the defendant's title to the bonds, which is directly assailed in the plaintiff's complaint, which also denies any right whatever in the defendant under the same.

The whole case shows no valid objection, in law or equity, to the defendant's title and right to hold the bonds.

But the case does disclose, on the part of the directors and managers of the railroad company, a blamable method of conducting its affairs, likely to result in injury to its true interests. The whole issue of its mortgage bonds, $4,500,000, was intrusted to the control of its president, who seems, without let or hindrance, to have been individually chargeable with their negotiation. The evidence shows him to have been inexperienced in such matters and wholly incompetent for a trust and mission of that nature and magnitude. He placed himself in confidential communication and relation with parties of no commercial standing, means or suitable business connections, for an undertaking of this character.

He pledged to and through them bonds of large nominal

value as security for loans of inconsiderable sums of money. In this way he fixed a low estimate upon the value of the securities in a market in which, in fact, he afterward sought to negotiate them.

The agents he selected were unfitted for the business. By his own instrumentality the bonds were placed in such condition and relation, as was quite likely to result in their falling into the hands of innocent parties, through whom the company would, in the end, suffer loss.

If a modicum of the real earnestness and legal ability, which has marked the conduct of this suit in the interest of the corporation, had been invoked in the beginning, when good counsel was needed, it is not likely that the plaintiff would now hold the position of a suitor in a court of equity, for relief against bonds issued and delivered by its president.

But notwithstanding the negligence of the plaintiff, I am not inclined to the view that the defendant, although he acted in good faith, and has a legal title to the bonds, can hold them beyond the value he paid and parted with on their purchase. I think he is entitled to full and complete indemnity, but nothing more.

The case shows that the plaintiff had absolutely and unconditionally parted with the bonds. They were originally pledged only to King & Sutton, and through them to others, as collateral security for small loans, in all, not exceeding $2,000. King & Sutton undertook absolutely to sell the bonds to Dunscomb.

It has been held above that Dunscomb, under the circumstances, obtained a good title. Had he attempted to enforce them by action, it may be that he could not have recovered more than the value of the consideration paid. I do not think that he could.

But, as far as the defendant's rights are concerned, equity and good conscience is satisfied if he is allowed to receive full indemnity out of the bonds. This determination, while it inflicts loss upon the plaintiff, saves the defendant to the

extent of his advances upon the strength of Dunscomb's possession and title (*Todd* agt. *Shelburne*, 8 *Hun*, 510, *and cases cited in the opinion of* DANIELS, *J.*).

I am obliged to look beyond the simple question of the legality of the defendant's title in this instance, and determine the extent of his claim from the attitude of the parties under the pleadings.

The defendant, it appears, has commenced an action against the trustees under the mortgage, for the purpose of enforcing payment of the bonds out of the property of the plaintiff. The plaintiff is not a party to that action, and has had no opportunity to present its defense, in whole or in part, and hence this action.

While the relief specifically demanded by the plaintiff must be denied, yet, I am constrained to think that I am called upon to determine the amount of the defendant's claim, legal and equitable, to the bonds, and thus define and limit the extent of his right to recover on the same, as the defendant asks for affirmative relief. He is entitled to hold the bonds and to recover and be paid thereon the amount of cash paid, $3,611.55, and the sum of $5,700, the amount of his claim against Dunscomb which he surrendered, with interest on both sums at the rate of seven per centum per annum from the time of his purchase.

I do not see sufficient in the evidence to impeach the title of the defendant to the overdue coupons, or with his right to enforce the payment for the full amount of same. They are negotiable instruments (*Aurora City* agt. *West*, 7 *Wallace*, 105; *Knox County* agt. *Aspinwall*, 21 *How.* [*U. S.*], 589; *City of Lexington* agt. *Butler*, 14 *Wallace*, 296).

Some of these coupons, it is true, the defendant purchased from King, but the coupons in his hands stood on an entirely different footing from the bonds, which he and his partners received from Lomax. I do not see but that he could give a good title to them.

Judgment must therefore be rendered in favor of the

defendant, establishing his legal title to the bonds and coupons, and his right to hold the same and collect and receive thereon, the whole amount of the coupons, and, in addition, the sums and amounts above mentioned, with the costs and disbursements to this action.